## GILL et al. v. COLTON et al.

(Circuit Court of Appeals, Fourth Circuit. April 14, 1926.)

No. 2395.

1. **Adverse possession** ⬙13—Adverse possession under color and claim of title for 28 years held to have ripened into title, in absence of circumstances preventing statute from running (Barnes' Code of W. Va. c. 104, § 1).

Under Barnes' Code of West Virginia, c. 104, § 1, adverse possession under color of title, by person claiming land as his own for 28 years, *held* to have ripened into title, in absence of circumstances preventing statute from running.

2. **Adverse possession** ⬙45—Possession not prevented from ripening into title by litigation against predecessors in title which had terminated.

Possession of one purchasing and paying for land and obtaining conveyance three years after ejectment action had terminated in final judgment against his predecessors in title was not precluded by such action from ripening into title.

3. **Mines and minerals** ⬙49.

Adverse possession of surface after there has been severance of minerals is not posses-

sion of minerals, so as to give owner title thereto.

4. **Mines and minerals** ⬙49.

General presumption is that one having possession of surface has possession of subsoil also, unless there has been severance of minerals.

5. **Mines and minerals** ⬙49—Deed, held not accepted and not to sever minerals from surface rights, though it was not returned to grantor.

Where claimants of land without request from grantees, executed deed, reserving oil and minerals, to adverse claimants who were in possession, and left it with grantees' mother, and one of grantees, when it was called to his attention, refused to have anything to do with it, there was no acceptance and no severance of minerals from surface rights, so as to prevent adverse possession, though deed was not returned to grantor.

6. **Lost instruments** ⬙8(3).

It is incumbent on one seeking to establish lost instrument to prove it by evidence of clearest and most satisfactory character.

7. **Estoppel** ⬙29(1)—Though delivery of deed reserving mineral rights would estop grantee from claiming mineral rights by adverse possession, it could not create estoppel against one claiming under prior contract of purchase, having no knowledge of deed.

Though delivery of deed reserving mineral rights would work severance of such rights from surface rights as against adverse possession by grantee accepting it, on principle of estoppel, it could not create estoppel against one claiming land under prior contract of purchase, where deed was not made to nor accepted by him, and he had no knowledge of its existence.

8. **Vendor and purchaser** ⬙231(4)—Purchaser is not chargeable with notice of reservation of mineral rights in lost and unrecorded deed not within chain of title under which he claimed.

Purchaser of land is not chargeable with notice of provisions of lost and unrecorded deed, reserving mineral rights which was not within chain of title under which he claimed.

9. **Vendor and purchaser** ⬙233.

In West Virginia, an unrecorded deed is void as to subsequent purchaser for value and without notice.

10. **Vendor and purchaser** ⬙242—To obtain equitable relief based on lost and unrecorded deed against subsequent purchaser not party to deed, it is incumbent to show that he took land with notice of equity.

To obtain equitable relief based on lost and unrecorded deed, reserving mineral rights to grantor against subsequent purchaser not a party to the deed, it is incumbent to show that purchaser took land with notice of equity.

11. Mines and minerals &=55(8)—Owners claiming mineral rights under reservation in lost and recorded deed, as against adverse claimant holding under color of title, held guilty of laches.

Owners claiming mineral rights under reservations in lost and unrecorded deed, as against adverse claimant holding under color of title for more than statutory period, *held* guilty of laches, barring equitable relief, by failure to bring action for 28 years, although oil and gas lease had been executed before such time.

Appeal from the District Court of the United States for the Southern District of West Virginia, at Huntington; George W. McClintic, Judge.

Suit by Sabin W. Colton, Jr., and others, trustees of the Guyandot Land Association, against Thomas J. Gill and others. Decree for plaintiffs, and defendants appeal. Reversed and rendered.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

Lon G. Marks, of Huntington, W. Va., for appellants.

W. C. W. Renshaw, of Huntington, W. Va., for appellees.

PARKER, Circuit Judge. This is an appeal from a decree in equity, establishing a lost deed and decreeing the plaintiffs to be the owners of mineral rights reserved thereby in 150 acres of land in Cabell county, W. Va. The appellants were defendants in the District Court, and the appellees were plaintiffs. They will be referred to here in accordance with their respective positions in that court.

Plaintiffs are trustees of the Guyandot Land Association. They claim title to the mineral rights in controversy as successors in title to Abiel A. Low and others, who, in turn, claimed under grants from the commonwealth of Virginia to one Samuel Smith, and who in the year 1874 instituted an action in ejectment in the United States District Court for the District of West Virginia against Winchester Adkins and others to recover approximately 300,000 acres of land in West Virginia embracing the 150 acres in controversy in this suit. C. L. Rolfe and P. H. McCullough, who claimed title adversely to plaintiffs, were duly made parties to said action; and on June 7, 1879, and November 17, 1880, jury trials were had as to the interests claimed by them respectively, and at the same time judgments were entered in favor of the plaintiffs and against them, and writs of possession were awarded to the plaintiffs.

In March, 1883, the defendant Nelson Holton bought the land in controversy in connection with T. J. and H. A. Gill from B. J. McComas; the arrangement being that the Gills should have the timber, and that the land including the minerals should be deeded to Holton. This was on or about the 6th day of March, 1883. Deed of McCullough of that date was executed conveying to the Gills the one-half interest which he claimed in the land, and McComas transferred to them his rights as the purchaser of the one-half interest of Rolfe which had been sold under a decree of the circuit court of Cabell county. Deed was subsequently made to them covering the Rolfe interest by the commissioner in that suit. In October, 1884, T. J. and H. A. Gill executed to Nelson Holton a deed embracing the land in controversy for the recited consideration of $153.26; but the undisputed evidence is that Holton went into possession of the land at the time the contract was made for its purchase in March, 1883, and has since been continuously in possession of same, claiming it as his own. All of the deeds hereinbefore referred to were duly recorded in Cabell county at or about the time of their execution.

The claim of plaintiffs to equitable relief arises in connection with a lost and unrecorded deed by which they contend that their predecessors in title conveyed to H. A. and T. J. Gill the 150-acre tract of land with a reservation of the oil and mineral rights from the terms of the conveyance. The contention of plaintiffs is that this deed severed the mineral rights in the land from the surface rights and prevented the statute of limitations from running in favor of Nelson Holton as to the mineral rights and from giving him title thereto by adverse possession. The facts with regard to this unrecorded deed are that on March 23, 1883, after Nelson Holton had contracted to buy the land, one Kuhn, as agent and attorney in fact of Low and others, predecessors in title of plaintiffs, executed a quitclaim deed conveying to H A. and T. J. Gill the 150 acres in controversy, but reserving the oil and mineral interest in the land to the grantors. Kuhn went to the home of T. J. Gill and left this deed with Gill's mother. When the attention of Gill was called to the deed by his mother, he refused to accept it or to have anything to do with it. There is no evidence that the attention of H. A. Gill was called to the deed or that Nelson Holton ever heard of it.

The defendant Nelson Holton remained in the undisturbed possession of the land

from March, 1883, until June, 1911, a period of 28 years prior to the institution of this suit; and the plaintiffs asserted no claim to the oil or mineral rights, and made no effort to establish the lost deed, notwithstanding the fact that on August 2, 1899, Holton executed a lease granting the oil and gas rights in the land to the Buffalo Oil & Gas Company, which lease was duly recorded in the office of the clerk of Cabell county on November 21, 1899. It further appears from the record that after instituting this suit in June, 1911, plaintiffs allowed it to pend in court without bringing it to trial or even taking evidence in the cause until the year 1925. Kuhn, who executed the deed, died in 1910 prior to the bringing of the suit, and H. A. Gill and his mother died some time prior to the hearing.

[1] From the foregoing statement of facts, it appears that the Gills are claiming no interest in the mineral rights in controversy. On the contrary, all of their interest therein has been vested in Nelson Holton. He had been in adverse possession of the land under color of title, claiming it as his own for more than twice the statutory period prior to the institution of this suit, and consequently his possession had ripened into title, unless there was something which prevented the statute from running in his favor. Barnes' Code (W. Va.) c. 104, § 1; Riffle v. Skinner, 67 W. Va. 75, 67 S. E. 1075; Summerfield v. White, 54 W. Va. 311, 46 S. E. 159. In the case last cited it is said:

"Under our statute, such possession for 10 years gives perfect title, not a mere right to continue the possession, not a title to be lost by mere temporary abandonment of actual possession. It is not only a defensive title, but one which will sustain an action of ejectment as effectually as a deed or a grant."

[2] Holton was not a party to the ejectment suit in which judgment was entered in favor of the predecessors of title of plaintiffs, nor was he a pendente lite purchaser. On the contrary, he purchased and paid for the land and obtained a deed of conveyance embracing same three years after the litigation had been terminated by final judgment. There is nothing in connection with that action which prevented his possession ripening into title, as there was in the case of Midkiff v. Colton, 252 F. 420, 164 C. C. A. 344, relied on by plaintiffs.

[3, 4] The plaintiffs contend, however, that there was a severance of the mineral rights from the surface of the land by reason of the deed executed by Kuhn on March 23, 1883, reserving the mineral rights to the predecessors in title of plaintiffs, and that as a result thereof the adverse possession of Holton did not extend to the mineral rights. It is well settled that possession of the surface after there has been a severance of the minerals is not possession of the minerals, and can give the surface owner no title thereto. Wallace v. Elm Grove Coal Co., 58 W. Va. 449, 52 S. E. 485, 6 Ann. Cas. 140; Midkiff v. Colton, supra. But, unless there has been such severance, it is a general presumption that one who has possession of the surface has possession of the subsoil also. 2 C. J. 71; Wallace v. Elm Grove Coal Co., supra. The contention of plaintiffs that there was a severance cannot be sustained (1) because there was no acceptance of the deed relied upon to create the severance even by the Gills who were named as grantees therein; (2) because Holton had contracted for the purchase of the land prior to the attempted delivery to the Gills; and (3) because Holton had no notice of the deed, which was unrecorded, or of the attempted reservation of the mineral interests therein.

[5, 6] With respect to the question of acceptance of the deed tendered by Kuhn, there is a vital difference between the case at bar and Midkiff v. Colton, relied on by plaintiffs. In that case the deed was executed to the defendants in the ejectment suit and was actually delivered by Kuhn to Abraham Midkiff, who carefully preserved it as a muniment of title. It conferred upon him a right in the surface of the land, which otherwise he, as a party to the ejectment suit, was estopped from claiming by the judgment therein. The court properly held that, having preserved the deed and having remained in possession of the land thereunder, he would be presumed to have accepted the deed and to have assented to its terms, citing as authority the case of Guggenheimer v. Lockridge, 39 W. Va. 457, 19 S. E. 874, which lays down the rule that in conveyances beneficial to the grantee the assent of the grantee will be presumed until his dissent be shown. But in this case the Gills were not parties to the ejectment suit. They together with Holton had entered into a contract to purchase the land and were in possession claiming it. The deed was not delivered to them but to their mother, who was not their agent to accept delivery. They did not accept it, preserve it, or hold under it; but, on the contrary, when the deed was called to the attention of T. J. Gill he refused to have anything to do with it, saying that it was a trick on the part of the land

company. The deed reserved in the grantors a right, which, according to the uncontradicted testimony, the Gills denied that they possessed. Was it necessary, to prevent this reservation from working a severance of the mineral interests and the vesting in the grantors of an estate therein, that the Gills take the deed back to Kuhn and notify him that they refused to accept it? We think not. The Gills, not having requested the execution of the deed, and not having authorized their mother to accept delivery, were charged with no duty with respect thereto. In tendering the deed to her son, Gills' mother was pro hac vice the agent of the grantors, and, when T. J. Gill refused to accept the deed from her, this was sufficient. As there is no evidence apart from the delivery of the deed to the mother of the Gills that the grantors ever accepted it, and as the evidence is uncontradicted to the effect that they refused to accept it, we must hold that there was no acceptance of the deed on the part of the Gills, and consequently that it could not have operated to sever the minerals from the surface rights. It is incumbent upon one seeking to establish a lost instrument to prove it by evidence of the clearest and most satisfactory character. 17 Cyc. 778; Renner v. Columbia Bank, 9 Wheat. 581, 6 L. Ed. 166; Loftin v. Loftin, 96 N. C. 94, 1 S. E. 837. On this question of acceptance the rule applicable is well stated in the case of Guggenheimer v. Lockridge, relied upon by plaintiffs and cited by this court in Midkiff v. Colton, as follows:

"A deed must not only be delivered by the grantor but must also be accepted by the grantee. Acceptance may be expressed by signing the deed or otherwise or may be implied from circumstances. The assent of the grantee will be presumed, where the deed is beneficial to him, until dissent appear. Where dissent or disclaimer appears, the deed is inoperative, and the title to the thing granted reverts to the grantor by remitter from such disclaimer."

[7] But, even if there had been an acceptance of the deed by the Gills, we do not see how this could sever the mineral interests as against Holton, for it appears that, at the time of the alleged delivery of the deed to the Gills, Holton had already contracted to purchase the lands and deed had been made to the Gills upon the agreement that they should cut the timber and make deed to him. The delivery of the deed reserving the mineral interests would work a severance of such interests from the surface rights as against

the grantee accepting it on the principle of estoppel; but manifestly it could not create an estoppel against one claiming land under a prior contract of purchase, where the deed was not made to nor accepted by him, and where he had no knowledge of its existence. [8, 9] And, even if there had been an acceptance of the deed by the Gills and no conveyance or contract to convey to Holton until afterwards, still, as there is no evidence that he had knowledge of the deed or of the reservations contained therein or the estoppels created thereby, and as it was not recorded, he could not be affected by it. It was not within the chain of title under which he claimed, and consequently he was not chargeable with notice of its provisions. Lewis v. Barnhart, 145 U. S. 56, 12 S. Ct. 772, 36 L. Ed. 621; 39 Cyc. 1719. And in West Virginia it is well settled that an unrecorded deed is void as to a subsequent purchaser for value and without notice. Williamson v. Wayland Oil & Gas Co., 79 W. Va. 754, 92 S. E. 424; Dulin v. Ohio River R. Co., 73 W. Va. 166, 80 S. E. 145, L. R. A. 1916B, 653, Ann. Cas. 1916D, 1183.

[10] The fact that plaintiffs failed to show notice to Holton of the lost and unrecorded deed is an important distinction between this case and Midkiff v. Colton, relied on by plaintiffs, and this fact would of itself justify the refusal of the equitable relief prayed. Plaintiffs ask this equitable relief as against Holton, who was not a party to the deed, solely because he was the purchaser of the property to which their alleged equity attaches. To obtain equitable relief against him it was incumbent on them to show that he took the land with notice of this equity (Ellison v. Torpin, 44 W. Va. 415, 30 S. E. 183; 39 Cyc. 783; Midkiff v. Colton, supra), and this they have failed to do.

[11] And, aside from other considerations, we think that the plaintiffs have been guilty of such laches in this case as would bar their right to equitable relief. They base their claim to valuable mineral rights upon a mere reservation in a deed which they contend was executed to adverse claimants, and which they neither delivered in person to the grantees nor recorded. Before instituting this suit they allowed the defendant to remain in the undisturbed possession of the land for 28 years without obtaining from him any acknowledgment of their alleged rights in the mineral interests, without attempting to have the deed reserving mineral interests placed on record, and, so far as the evidence shows, without even making inquiry to ascertain whether the deed making

reservation had been accepted or not. And they allowed this, notwithstanding the fact that the defendant in the meantime had executed an oil and gas lease on the property, which was duly recorded in the county, and was notice to the world that he was claiming the mineral interests in the land. Not until 12 years after this lease was executed, and 28 years after the execution of the alleged lost deed, and not until after the mouth of Kuhn had been closed by death, was suit instituted, and not until 14 years later was evidence taken or the suit brought to hearing. When the hearing was finally had, not only Kuhn but also H. A. Gill and his mother had died, and their evidence had been forever lost. The plaintiffs certainly have not shown such reasonable diligence as should appeal to this court.

"A court of equity," says Lord Camden, "which is never active in relief against conscience or public convenience, has always refused its aid to stale demands, where the party has slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence." Smith v. Clay, 3 Brown Ch. 638; Pomeroy's Equity Jurisprudence (4th Ed.) vol. 1, § 419; Hammond v. Hopkins, 143 U. S. 224, 12 S. Ct. 418, 36 L. Ed. 134; Gildersleeve v. New Mexico Mining Co., 161 U. S. 573, 16 S. Ct. 663, 40 L. Ed. 812.

And "the mere institution of a suit does not relieve a person from the operation of the rule of laches; if he fails to prosecute his suit diligently, the consequences are the same as though no suit had been begun." 21 C. J. 215; Johnston v. Standard Mining Co., 148 U. S. 360, 13 S. Ct. 585, 37 L. Ed. 480; Sullivan v. Portland R. Co., 94 U. S. 806, 24 L. Ed. 324; Baber v. Baber, 121 Va. 740, 94 S. E. 209; Drees v. Waldron (C. C. A. 8th) 212 F. 93, 128 C. C. A. 609; U. S. v. Fletcher (C. C. A. 8th) 242 F. 818, 155 C. C. A. 406; Northrup v. Brown (C. C. A. 8th) 204 F. 224, 112 C. C. A. 496; Hendryx v. Perkins (C. C. A. 1st) 114 F. 801, 52 C. C. A. 435.

For nearly half a century, therefore, plaintiffs have slept on their rights, and at this late day, after the witnesses have died by whom alone the alleged acceptance of the deed could be satisfactorily established or refuted, they ought not be heard to invoke the extraordinary powers of a court of equity to establish rights for which they apparently cared so little for so many years. Vigilantibus non dormientibus aequitas subvenit. As said by Mr. Justice Brewer:

"No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and longer possessor security, and induces and justifies him in all efforts to improve and make valuable the property he holds. It is a doctrine received with favor, because its proper application works out justice and equity, and often bars the holder of a mere technical right, which he has abandoned for years, from enforcing it when its enforcement will work large injury to many." Naddo v. Bardon (C. C. A. 8th) 51 F. 493, 2 C. C. A. 335.

For the foregoing reasons, we think that the decree of the learned District Judge should be reversed, and that decree should be entered for the defendants.

Reversed.